No. 34,259

U. S. Hodge and William Hodge, Executors of the Estate of L. D. Hodge, Deceased, *Appellants*, v. Warden Bishop, Administrator of the Estate of Florence Bishop, Deceased, *Appellee.*

(92 P. 2d 37)

Opinion filed July 8, 1939.

*Roy C. Davis, Warren H. White, Frank S. Hodge,* all of Hutchinson, and *Robert Y. Jones,* of Lyons, for the appellants.

*Hary H. Dunn, C. M. Williams, D. C. Martindell, W. D. P. Carey, W. E. Brown* and *J. H. Else,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action to recover on an alleged oral contract for services rendered by a daughter to her parents. Daughter and parents are dead, and the administrator of the daughter's estate filed a claim against her father's estate in the probate court. The administrators of the father's estate resisted the claim and the probate court rejected it.

The matter was appealed to the district court, where it was tried before a jury, which failed to reach a verdict. The administrators of the father's estate now appeal to this court on the only question open to our review—the sufficiency of the claimant's evidence to require its submission to the jury over defendants' demurrer thereto.

The record includes matters of fact extending over a long period of years. The late L. D. Hodge, of Rice county, was a man of substantial means. He and his wife lived to a great age. He died testate on August 6, 1937; his wife died two days before he did. They were survived by two sons, and one daughter, Mrs. Florence Bishop. She survived her father some five months, and died on January 12, 1938, at 65 years of age, leaving a husband, Warden Bishop, an adopted son, and an adopted daughter, Mrs. Max Walton.

The daughter, Florence, had married Warden Bishop many years ago without the approval of her parents, and a lifelong antipathy existed between L. D. Hodge and his son-in-law. This antipathy had even provoked personal violence, and civil litigation between them reached this court a quarter of a century ago. (*Hodge v. Bishop,* 96 Kan. 419, 151 Pac. 1105; *id.,* 101 Kan. 152, 165 Pac. 644.)

Warden Bishop and his wife lived on a farm in Rice county. In 1931 Mrs. Bishop became afflicted with cancer, for the cure or alleviation of which she entered a hospital in Hutchinson. Her doctors discovered her condition to be so serious that no attempt was made to remove the cancerous growth from her body, and she was professionally advised to place herself under the care of a Doctor Trueheart, of Sterling, for radium and X-ray treatments. Her father and mother resided in Sterling, and she entered their home and so remained as a member of their family until their deaths in August, 1937. She continued to reside at their home until her own death some five months subsequently.

The circumstances under which she took up her abode in her father's house and lived therein with her parents are the subject of the present controversy. Five days before her death Mrs. Bishop, through her attorneys, filed a verified claim against her father's estate for $7,000, on the alleged ground that pursuant to the request of her father and mother, on or about July 29, 1931, she left her home where she was living with her husband and went to the home of her parents and thereafter continuously lived with, cared for, looked after, and nursed them until their deaths. Her verified claim further alleged that at the time her parents made that request they "orally agreed with your claimant that she would be paid a reasonable compensation, or financial remuneration, for her services in caring for and nursing" them. She further averred that at "said time" and continuously thereafter she devoted all her time and attention "doing the housework, nursing and caring for her said parents, . . . purchasing provisions, . . . from said 29th day of July, 1931, until the dates of . . . [their] . . . deaths"; and that her services so rendered were reasonably worth $100 per month, or a total of $7,000.

Following Mrs. Bishop's death, her husband, as her administrator, filed a revived and substituted claim and demand in behalf of her estate, predicated substantially on allegations of fact similar to those contained in Mrs. Bishop's claim—an oral contract between her and her parents made on or about July 29, 1931, wherein they agreed that she would be paid "a reasonable compensation, or financial remuneration" for her services in caring for and nursing her parents; and that pursuant thereto she had rendered the services to her parents as requested by them until their deaths, and that such services were reasonably worth $100 per month, or $7,000.

This claim and demand was rejected by the probate court, and an appeal to the district court followed. In the latter court the executors, U. S. Hodge and William Hodge, filed an answer denying the existence of any such contract as alleged in the claimant's exhibit of demand, denying that their sister had rendered any services whatever to their parents for which she expected compensation. The executors alleged that the claim ostensibly filed by their sister against her father's estate a few days before her death was merely the claim of her husband, Warden Bishop; that during the period covered by the claim Florence Bishop suffered from an incurable malignant cancer; that her husband had induced and forced her to

sign such claim at a time when she was suffering intense agony and was under the influence of drugs and narcotics and she did not realize what she had signed.

Answering further, the executors alleged that L. D. Hodge died testate, and in a codicil to his will provisions were made for Mrs. Florence Bishop, as follows:

"3. I give and devise to my sons, U. S. Hodge and Wm. Hodge, as trustees, the sum of ten thousand ($10,000) dollars which sum they shall invest in interest bearing notes secured by first mortgage on real estate, not more than 40% of the value of such real estate to be loaned upon any tract of land and all the interest arising from the said sum of ten thousand ($10,000) dollars, I direct them, as such trustees, after paying the taxes thereon, to pay to my daughter, Florence Bishop; the said interest to be paid semiannually when collected or deposited in the bank to her credit and said payments shall be made as long as she lives. At her death, if she have any children of her body surviving her, the interest upon the said sum of ten thousand ($10,000) dollars shall be paid to the said children or for their support and maintenance until they become of age in the same way and manner as is provided for the payment to my daughter.

"4. At the death of my daughter, if she leave no children of her body, or when such child or children arrive at lawful age, I give and devise the said ten thousand ($10,000) dollars to my sons, U. S. Hodge and Wm. Hodge.

. . . . . . . . . . . . . . . .

"6. The bequest herein made to my daughter, Florence Bishop, is made upon the express condition that she shall waive all claim of any real estate or personal property which I now own or of which I may die seized, and if she makes any claim to any such property, real or personal or attempts to contest or set aside my last will and testament or this codicil, or if she claims to own any of the real estate which I now own or that I gave her such real estate, she shall forfeit all claim to the bequest of ten thousand ($10,000) dollars as herein specified."

The executors further alleged that Florence Bishop was fully advised of the terms of the will, and that on or about September 10, 1937, she and they discussed its terms and provisions, and all three agreed that it would take considerable time to invest the money as provided in the bequest in her behalf, and that she agreed to accept the sum of $50 per month and the use of the house in Sterling for her natural life in lieu of the investment of the trust fund, and that the same would be deemed a full compliance with the last wills and testaments of L. D. Hodge and wife; and—

"That it was the understanding of said executors that such was also in full settlement of all claims which the said Florence Bishop might have; that at no time during these negotiations did the said Florence Bishop mention having any claim; that such claim was unknown and unthought of by the said exec-

utors . . . and that thereafter she was paid and received from said executors under this arrangement, the sum of $495.26, together with rent upon the house at Sterling to the time of her death; (that without this settlement the said Florence Bishop would have received nothing); that therefore, the said Florence Bishop and the claimants herein are estopped from making the claim set forth herein."

The executors answered further that although there was no contract for services as averred in the claimant's exhibit of demand and none of any consequence was ever performed, L. D. Hodge and wife nursed and cared for their daughter during the period set forth in said claim; they paid for radium and X-ray treatments for her, advanced to her spending money from time to time; and following their deaths she advised the executors that she had in her possession $210 in money belonging to her parents and that they allowed her to keep that sum at the time of their agreement with her on or about September 10, 1937.

When the cause came on for trial the evidence adduced in claimant's behalf tended to prove that in the summer of 1931 Mrs. Florence Bishop, after staying or visiting with her parents "three or four weeks," was about to return to her own home when the following incident occurred, according to the testimony of Mrs. Bishop's stepdaughter, Mrs. Max Walton, who was the principal witness for the claimant:

"I overheard a conversation between my mother [Mrs. Bishop] and L. D. Hodge with reference to her staying. . . . Grandma Hodge was in on that conversation herself. You see, grandpa could not hear, and we had to write to him whenever we wanted to converse with him. . . . Mom Bishop was preparing to go back out to the farm where her home was . . . and grandma and grandpa suggested they would like to have her stay with them, and they said that they would make it worth her difference, and pay her well if she would stay there with them and continue to take her treatments. . . . She told mom that if she would stay with them, with grandpa and grandma, that they would pay her well, and then she wrote the essence of that to grandpa, and he said, 'Yes, that was what he wanted.'

"Q. Did they say anything about how long she was to stay? A. Remain with them more or less—I don't know that they said definitely, but stay with them from then on out. I heard several conversations of this kind. There was nothing said about how long she was to stay, 'just that she would stay, of course as long as she was to take treatments, and the treatments seemed to continue on.' Mrs. Bishop did take treatments. I recall that she took three or four. As time went on she ceased to make preparations to go home 'because it became more or less of an understanding that she was to stay there and be more or less of a companion to them and take care of them.' *The first conversation took place shortly after she commenced to recover, and would prob-*

*ably be three or four weeks after she moved* up there. I cannot tell when the next conversation took place. In my best judgment the second took place perhaps two or three weeks after the first. The language of the second was 'of the same nature as the first one, that she would remain there and take care of them, and they would pay her well. They were still insistent she should stay there and take her treatments and more or less take care of them.'" (Italics ours.)

Another witness for plaintiff, May Leak, overhead the same or a similar conversation between mother (Mrs. Hodge) and daughter (Mrs. Bishop):

"Q. And this conversation you heard, you heard Mrs. Bishop say she will see whether she wanted to stay there or not, continue to [stay] there, and that she didn't know whether she wanted to or not? A. She said, 'I have got a home, Ma,' and she says, 'Well, we want you here, this will be your home.'

"Q. And 'This will be your home, you can stay here, this will be your home?' A. Yes, she said, 'This home will be yours, and you will have plenty to take care of you when we are gone. We want you to stay here as long as we live.'"

Mrs. Bishop never returned to her own home except for short visits. A year or two after she took up her abode with her parents, the farm house in which she and her husband had resided was burned. Her husband fixed up living quarters for himself in a milk house on the farm, and doubtless a faithful wife would have cheerfully shared his lot thereat but for the controverted circumstances which caused her to stay with her parents—the inducement offered her to care for them in their old age or her own hopeless invalidism.

There was evidence that Mrs. Bishop's health did improve for a time under radium treatments, and it was shown that she was accustomed to take her father's pension check to the bank, kept track of her parent's bank account, ordered their groceries, attended to the payment of the household bills for gas, heat, light and water. Occasionally she helped her father to adjust his truss and rubbed him when he had a heart attack. Instances were also testified to by claimant's witnesses to the effect that occasionally Mrs. Bishop had run the carpet sweeper, baked a pie, cooked a meal "when she was able," scrubbed the floor, and she had been seen to "pull the hose in the yard a few times." There was also testimony tending to show that Mrs. Bishop's companionship to her parents was desired and appreciated by them, and that the mere matter of her personal services was not their principal concern, as they were well-to-do and could hire domestic help, and that as their aging years brought the usual infirmities they did hire such help.

The foregoing summarizes the principal features of the evidence adduced to support the appellee's claim against the Hodge estate. Was it sufficient to take the case to the jury as against the demurrer thereto?

In ruling on this question we cannot give any consideration to testimony which tended to controvert or disprove the claimant's allegations of fact. (*Rosenfeld Co. v. Gleed*, 110 Kan. 75, 202 Pac. 611; *Crawford v. Southern Kansas Stage Lines Co.*, 145 Kan. 580, 66 P. 2d 601.)

Counsel for appellants argue strongly against the reasonableness of the claim. But that argument must be addressed to the triers of fact; it serves no purpose in this appeal.

Counsel for appellants also remind us of the rule of law which exacts a quality and standard of evidence to prove a daughter's claim for compensation for services to her aged parents much higher than is requisite to prove an ordinary issue of fact between litigants, because there is a presumption that such services are filial and gratuitous, and not intended to be compensated in money (*Nelson v. Peterson*, 147 Kan. 507, 78 P. 2d 20). They also invoke the rule that to support an oral contract for compensation for such services the evidence to prove its existence must be clear and convincing and its terms definite and certain. (*Heine v. First Trust Co.*, 141 Kan. 370, 41 P. 2d 767.) However, we cannot doubt that the jury was properly instructed on these phases of the law of evidence pertinent to establish this sort of a claim against an estate.

Recurring to appellants' contention that there was no evidence to prove the precise contract alleged in claimant's exhibit of demand, and that the testimony of the principal witnesses for the claimant, Mrs. Walton and May Leak, showed clearly that the contract, if any, under which Mrs. Bishop was induced to stay, arose out of the offer and promise made by Mrs. Bishop's parents, after she had been at their house three or four weeks and when she was about to return to her own home. Mrs. Walton's testimony was that Grandma Hodge speaking for L. D. Hodge and herself said "they would like to have her stay with them, and . . . they would . . . pay her well if she would stay there with them and continue to take her treatments." May Leak's testimony was that Mrs. Bishop said she didn't know whether she wanted to stay or not, and Grandma said, "This will be your home, you can stay here, this will be your home. . . . This home will be yours, and you will have plenty to take

care of you when we are gone. We want you to stay here as long as we live." Mrs. Bishop did stay, and that fact is susceptible of an inference that she decided to do so in response to the offer and promise of her parents as testified to by Mrs. Walton and May Leak. We do not regard the variance between the oral contract alleged in the exhibit of demand and the one testified to by Mrs. Walton and Miss Leak as fatal to a recovery—if the latter was clearly established to the satisfaction of the jury, and we think its existence was a jury question.

It is finally contended that if there ever was any such oral contract as alleged in claimant's exhibit of demand, or any such oral contract as claimant's evidence tended to prove, it has been fully performed and there has been no breach. It is urged that the claimed agreement that Mrs. Bishop was to have reasonable compensation or financial remuneration was generously performed by her parents in their lifetime and by their executors after their deaths, for as long as Mrs. Bishop survived them. It is argued that during the long interval of Mrs. Bishop's invalidism she had a good home with her parents, that they provided for her, paid her radium and medical bills, that they had made generous provision for her in their wills, and that when they died their executors permitted her to stay in the Hodge home and paid her $50 per month and made other generous payments to her or on her account. But even these considerations, if well proven, must be submitted to the jury for their consideration; they cannot be held at this inconclusive stage of the case to demonstrate that the trial court committed error in overruling the demurrer to the claimant's evidence in support of the exhibit of demand which the probate court rejected and which the trial court held was sufficient to take the case to the jury.

The judgment is affirmed.